**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FIRSTMERIT CORPORATION SHAREHOLDER LITIGATION | Lead Case No:  5:16-cv-00461 (Lead Case) |
| | JUDGE BENITA Y. PEARSON |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | MASTER FILE |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**
**<u>APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

I. BACKGROUND OF THE LITIGATION.......................................................... 2

    A. The Merger, Litigation, Settlement Negotiations, and Confirmatory Discovery ........... 2

    B. Preliminary Approval and Issuance of the Notice ................................................. 3

II. THE SETTLEMENT TERMS ........................................................................... 3

III. ARGUMENT ....................................................................................................... 4

    A.    The Proposed Settlement Should Be Finally Approved ........................................... 5

        1.    The Applicable Legal Standard .................................................................. 5

        2.    The Settlement is Fair, Reasonable, and Adequate ...................................... 5

            a.    Information Concerning FirstMerit's and Huntington's Financial Projections Used in Sandler's Valuation Analyses........................ 7

            b.    Information Concerning Sandler's Financial Analyses ............... 10

            c.    Information Concerning the Background of the Merger ............. 12

        3.    The Settlement is the Product of Good Faith, Arm's-Length Negotiations ........................................................................................... 14

        4.    The Complexity, Time, and Expense of Continued Litigation Supports Final Approval of the Settlement .......................................................... 15

        5.    The Stage of Proceedings and the Amount of Discovery Completed........ 16

        6.    The Strength of Plaintiffs' Case Compared to the Terms of the Settlement Supports Approval of the Settlement.......................................... 16

        7.    The Views of Experienced Counsel ........................................................... 18

        8.    The Class Overwhelmingly Supports the Settlement................................... 19

        9.    The Public Interest Favors Approval of the Settlement.............................. 19

IV. CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES........................ 20

V. THE FEE AND EXPENSE AWARD SHOULD BE APPROVED................................ 20

    A.    The Applicable Legal Standard .................................................................. 21

    B.    A Fee and Expense Award is Appropriate.................................................... 24

C.     The Requested Fee and Expense Award Is Reasonable ............................................. 25

       1.     The Value of the Services on an Hourly Basis .............................................. 25

       2.     The Contingent Nature of the Fee ................................................................. 26

       3.     The Value of the Benefit Rendered to the Class ........................................... 28

       4.     The Complexity of the Litigation .................................................................. 28

       5.     The Professional Skill and Standing of Plaintiffs' counsel ......................... 29

       6.     Society's Stake in Rewarding Attorneys Who Produce Such Benefits in Order to Maintain an Incentive to Others ................................. 29

VI.     CONCLUSION ............................................................................................................. 30

## **TABLE OF AUTHORITIES**

**Cases**

*Adcock-Ladd v. Secretary of Treasury*,
    227 F.3d 343 (6th Cir. 2000) ................................................... 27

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975)................................................................ 21

*Arnold v. Soc'y for Sav. Bancorp*,
    650 A.2d 1270 (Del. 1994) .................................................... 13

*Bert v. AK Steel Corp*.,
    No. 1:02-cv-467, 2008 U.S. Dist. LEXIS 111711 (S.D. Ohio Oct. 23, 2008) ......................... 18

*Boeing Co. v. Van Gernert*,
    444 U.S. 472 (1980)................................................................ 21

*Brent v. Midland Funding, LLC*,
    No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sep. 1, 2011) .................. 18, 19

*Brown v. Brewer*,
    No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010)....... 10

*Bunyan v. Ordan*,
    No. 1:12-cv-01185-CMH-TRJ (E.D. Va. Jan. 24, 2014)......................................... 7

*Chrapliwy v. Uniroyal, Inc.*,
    670 F.2d 760 (7th Cir. Ind. 1982) ......................................... 26

*Collier v. Brightpoint, Inc.*,
    No. 1:12-cv-01016, 2013 U.S. Dist. LEXIS 62125 (S.D. Ind. May 1, 2013)......................... 28

*Connectivity Sys. Inc. v. Nat'l City Bank*,
    No. 2:08-cv-1119, 2011 U.S. Dist. LEXIS 7829 (S.D. Ohio Jan. 25, 2011)......................... 25

*David P. Simonetti Rollover IRA v. Margolis*,
    C.A. No. 3694, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008)......................... 8

*Denney v. Wallace*,
    No. 2:10-cv-01154, slip op.  (W.D. Pa. Sept. 9, 2011)......................... 28

*Doe v. Bradley*,
    64 A.3d 370. 396 (Del. Super. Ct. 2012) ................................. 19

iv

*Gascho v. Global Fitness Holdings, LLC*,
   822 F.3d 269 (6th Cir. 2016) ................................................................ 5, 22, 26, 27

*Granada Invest., Inc. v. DWG Corp.*,
   962 F.2d 1203 (6th Cir. 1992) ................................................................................ 5

*Hall v. Cole*,
   412 U.S. 1 (1973) ................................................................................................ 21, 24

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) .................................................................................................. 22

*In re Atheros Commc'ns, Inc. S'holder Litig.*,
   No. 6124-VCN, 2011 Del. Ch. LEXIS 36 (Del. Ch. Mar. 4, 2011) ......................... 14

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................................ 15

*In re Broadwing, Inc. ERISA Litig.*,
   252 F.R.D. 369 (S.D. Ohio 2006) ............................................................................ 26

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) .................................................................... 29

*In re Celera Corp. S'holder Litig.*,
   2012 Del. Ch. LEXIS 66 (Del. Ch. Mar. 23, 2012) ................................................ 11

*In re Cenco, Inc. Sec. Litig.*,
   519 F. Supp. 322 (N.D. Ill. 1981) ............................................................................ 27

*In re Complete Genomics, Inc. S'holders Litig.*,
   No. 7888-VCL (Del. Ch. Nov. 9, 2012) .................................................................. 14

*In re Delphi Corp. Sec.*,
   248 F.R.D. 483 (E.D. Mich. 2008) .................................................................... 19, 29

*In re Emerging Commc'ns, Inc. S'holder Litig.*,
   No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) ................................... 9

*In re GeoEye, Inc. S'holder Litig.*,
   No. 1-12-cv-00826-CMH/TCB (E.D. Va. Sept. 6, 2013) ......................................... 7

*In re GeoEye, Inc., S'holder Litig.*,
   Consol. No. 1:12-cv-00826, slip op. (E.D. Va. Sept. 6, 2013) ................................ 28

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
906 A.2d 766 (Del. 2006) .......................................................... 20

*In re Kraft Foods Group, Inc.*,
Case No. 3:15-CV-262-HEH (E.D. Va. Mar. 10, 2016) .......................... 7

*In re Lear Corp. S'holder Litig.*,
926 A.2d 94, 114 (Del. Ch. 2007) ............................................... 14

*In re Netsmart Techs., Inc., S'holders Litig.*,
924 A.2d 171 (Del. Ch. 2007) ........................................ 7, 8, 9, 12

*In re PNB Holding Co. S'holders Litig.*,
No. 28-N, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006) ................. 7

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ............................................... 16

*In re Pure Res., Inc. S'holders Litig.*,
808 A.2d 421 (Del. Ch. 2002) ........................................ 10, 12, 13

*In re Radiology Associates, Inc.*, 611 A.2d 485 (Del. Ch. 1991) ................ 11

*In re Schering-Plough/Merck Merger Litig.*,
No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010) ..... 4, 7, 24, 25

*In re Sunrise Sec. Litig.*,
131 F.R.D. 450 (E.D. Pa. 1990) ................................................ 16

*In re Talley Indus., Inc. S'holders Litig.*,
No. 15961, 1998 Del. Ch. LEXIS 53 (Del. Ch. Apr. 13, 1998) .................... 6

*In re Telectronics Pacing Sys.*,
137 F. Supp. 2d 1029 (S.D. Ohio 2001) ....................................... 29

*In re WM. Wrigley Jr. Co. S'holders Litig.*,
No. 3750-VCL, 2009 Del. Ch. LEXIS 12 (Del. Ch. Jan. 22, 2009) ................ 4

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. V. Gen. Motors Corp.*,
497 F.3d (6th Cir. 2007) ...................................................... 5

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) .................................................. 22

*Kahan v. Rosenstiel*,
424 F.2d 161 (3d Cir. 1970) ................................................... 24

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ................................................................. 22

*Kosseff v. Ciocia*,
    No. 188, 2009 Del. Ch. LEXIS 242 (Del. Ch. Feb. 26, 2009)................................. 19

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ................................................................. 17

*Lonardo v. Travelers Indem. Co.*,
    706 F. Supp. 2d 766 (N.D. Ohio 2010)........................................................ 19

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
    148 F. Supp. 2d 1141 (D. Kan. 2001) ......................................................... 6

*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*,
    11 A.3d 1175 (Del. Ch. 2010)............................................................. 12, 14

*McGill v. Hake*,
    No. 1:15-cv-00217-TWP-DKL (S.D. Ind. Mar. 10, 2016) ...................................... 7

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970).................................................................... 6, 21, 24

*Nichting v. DPL Inc.*,
    No. 3:11-cv-141, 2011 U.S. Dist. LEXIS 76739 (S.D. Ohio July 15, 2011)...................... 9, 28

*Prandini v. Nat'l Tea Co.*,
    557 F.2d 1015 (3d Cir. 1977)................................................................. 23

*Prescott Small Cap, L.P. v. Coleman Co.*,
    C.A. No. 17802, 2004 WL 2059515 (Del. Ch. Sept. 8, 2004)................................... 11

*Ramey v. Cincinnati Enquirer, Inc.*,
    508 F.2d 1188 (6th Cir. 1974) ........................................................... 21, 25

*Rawlings v. Prudential-Bache Prop., Inc.*,
    9 F.3d 513 (6th Cir. 1993) .................................................................. 22

*Reade Alvarez v. Eltman, Eltman, & Cooper, P.C.*,
    237 F.R.D. 26 (E.D.N.Y. 2006) .............................................................. 18

*Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*,
    532 A.2d 1324 (Del. Ch. 1987)............................................................... 9

*Smillie v. Park Chem. Co.*,
710 F.2d 271 (6th Cir. 1983) ........................................................................ 21, 26

*Smith v. Ajax Magnethermic Corp.*,
No. 4:02-CV-0980, 2007 U.S. Dist. LEXIS 85551 (N.D. Ohio Nov. 6, 2007) ...................... 18

*Smith v. Robbins & Myers, Inc.*,
969 F. Supp. 2d 850 (S.D. Ohio 2013) ............................................................... 10

*St. Louis Police Ret. Sys. v. Severson*,
No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012) ...................... 6

*Turberg v. ArcSight*,
C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011) ...................................................... 11

*Vigna v. Emery Fed. Credit Union*,
No. 1:15-cv-51, 2016 U.S. Dist. LEXIS 166605 (S.D. Ohio Dec. 2, 2016) ...................... 25

*Walls v. JPMorgan Chase Bank, N.A.*,
No. 3:11-cv-673-DJH, 2016 U.S. Dist. LEXIS 142325 (W.D. Ky. Oct. 13, 2016) ............... 26

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982) ............................................................................ 16

 **Other Authorities**

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:5 (4th ed. 2002) ........... 15, 16

James Wm. Moore, *Moore's Federal Practice*
§ 23.83[1] (3d ed. 2002) ................................................................................ 5

Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and
Mergers & Acquisitions* (2d ed. 2013) ................................................................ 9

*Manual for Complex Litigation, Third* § 30.41 (3d ed. 1995). .................................... 5

**Rules**

Fed. R. Civ. P. 23 ...................................................................................... *passim*

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs Mary H. Wojno ("Wojno"), Jack Wilkinson ("Wilkinson"), and Michael Hafner ("Hafner") (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion requesting entry of an Order: (1) granting final approval of the proposed settlement (the "Settlement") of the above-captioned consolidated class action (the "Action") pursuant to a Stipulation of Settlement (the "Stipulation")[1] entered into by Plaintiffs and defendants FirstMerit Corporation ("FirstMerit" or the "Company"), the Company's Board of Directors,[2] Huntington Bancshares, Incorporated ("Huntington"), and West Subsidiary Corporation ("Merger Sub") (collectively, "Defendants") on September 28, 2016; (2) finally certifying a non-opt out Class (defined below) for purposes of effectuating the proposed Settlement; and (3) awarding Plaintiffs' counsel's unopposed application for fees and expenses.

The efforts of Plaintiffs and their counsel resulted in Defendants' disclosure to FirstMerit shareholders of previously undisclosed material information regarding the Merger, as well as the Company's financial future and the analyses performed by its financial advisor in support of the deal (the "Supplemental Disclosures"). Stipulation, Ex. A. The Supplemental Disclosures included information (outlined below) that allowed FirstMerit shareholders to cast a fully-informed vote on the Merger, thereby resolving the disclosure issues raised by Plaintiffs. The Company would not have disclosed this information without this lawsuit. Stipulation, Ex. A.

---

[1]      Unless otherwise noted, all capitalized terms shall have the same definitions as set forth in the Stipulation. A copy of the Stipulation is attached as Exhibit 6 to the Declaration of Shannon L. Hopkins in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys' Fees and Expenses ("Hopkins Decl."), filed herewith.

[2]      The Board is comprised of defendants Paul G. Grieg, John C. Blickle, Phillip A. Lloyd II, Terry L. Haines, R. Cary Blair, Karen S. Belden, Robert W. Briggs, Richard Colella, Gina D. France, J. Michael Hochschwender, Steven H. Baer, Russ M. Strobel, Lizabeth A. Ardisana, and Robert S. Cubbin (collectively, the "Board" or the "Individual Defendants").

In light of the material benefits caused by Plaintiffs' efforts, the Settlement also provides that Plaintiffs' counsel will seek an award of attorneys' fees and expenses not to exceed $315,000.00 (the "Fee and Expense Award"). Defendants have agreed not to oppose a request up to this amount. The Fee and Expense Award was negotiated at arm's-length after the material terms of the Settlement had been agreed to, is fair and reasonable in light of the substantial benefits achieved in the Settlement, and it is in line with fees awarded in similar litigation. Stipulation, ¶ 6.1. If awarded in full, the Fee and Expenses Award reflects a *negative* multiplier of to the total lodestar amount of $477.236.80; comprised of over 852 hours of work, not including the $21,043.76 in expenses expended by Plaintiffs' counsel.[3] To date, there have been no formal objections to this Settlement, including the Fee and Expense Amount.

As such, and for the reasons stated herein, Plaintiffs respectfully move this Court to approve the Settlement, finally certify the Class, and approve Plaintiffs' request for attorneys' fees and expenses. Defendants do not oppose the foregoing relief.[4]

## I.    BACKGROUND OF THE LITIGATION[5]

### A. THE MERGER, LITIGATION, SETTLEMENT NEGOTIATIONS, AND CONFIRMATORY DISCOVERY

A detailed description of the factual background and procedural history of the Action, as well as the efforts of Plaintiffs' counsel on behalf of the Settlement Class that resulted in the Settlement of the Action, is set forth in the Memorandum of Law in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Settlement, Notice and Class Certification, filed

---

[3]    These figures are detailed in the accompanying fee and expense declarations from Plaintiffs' counsel, attached as Exhibits 1-5 hereto.

[4]    Although this Motion is unopposed, this Memorandum of Law is submitted solely by Plaintiffs and does not represent the views of Defendants.

[5]    The facts set forth herein largely are drawn from the Stipulation (Ex. 6 to the Hopkins Decl.) and the docket of this consolidated matter.

with the Court on September 28, 2016 (ECF No. 78), as well as in pages 1 through 5 of the Stipulation. For the sake of brevity and judicial efficiency, these facts are not repeated here, but rather incorporated by reference.

### B.  PRELIMINARY APPROVAL AND ISSUANCE OF THE NOTICE

On September 28, 2016, Plaintiffs moved for entry of the Scheduling Order and Order Preliminarily Approving Proposed Settlement (the "Preliminary Approval Order") that would: (i) preliminarily approve the Settlement set forth in the Stipulation; (ii) preliminarily certify, for settlement purposes only, a non-opt-out Class; (iii) approve the form, manner, and content of the notice to be sent to the proposed class; and (iv) schedule a hearing at which the Court would consider final approval of the Settlement. ECF No. 78-2.

On October 7, 2016, the Court held a hearing on Plaintiffs' Preliminary Approval Motion, at which the Court and the parties agreed to modify the form and content of the Notice to provide a more fulsome and less complex notice experience to the Class. The Parties submitted a modified scheduling order, a short form notice, and a long form notice on October 14, 2016, which was further modified on October 26, 2016.

On October 31, 2016, the Court entered the Preliminary Approval Order and scheduled the Settlement Hearing for February 1, 2017. ECF No. 90. Thereafter, the short form notice was disseminated to the Class, and the long form notice and a copy of the Stipulation were publicly published on a website maintained by Plaintiffs' counsel on November 2, 2016. Following dissemination and publishing of the Notice, Plaintiffs' counsel was (and continue to be) available to members of the Class to respond to comments and answer questions from FirstMerit shareholders. To date, no member of the Class has lodged any formal objection to the Settlement.


## II.    THE SETTLEMENT TERMS

3

The Settlement required Defendants to disclose certain material information to members of the Class that Plaintiffs believed was critical to FirstMerit's shareholders' ability to make a fully informed decision regarding whether to vote for or against the Merger. The Supplemental Disclosures, which were set forth in an exhibit to a Form 8-K and filed with the SEC on June 7, 2016, provided material information to FirstMerit shareholders in advance of the June 13, 2016 Shareholders meeting regarding the Merger, namely:

1. The projections for FirstMerit's future financial performance identified by FirstMerit's managers and officers and relied upon by the Board and the Company's financial advisor, Sandler O'Neil Partners L.P. ("Sandler"), in its fairness analyses;

2. Key inputs and assumptions underlying Sandler's financial analyses in connection with its fairness opinion; and

3. A more accurate portrayal of the timeline of negotiations between the Company's former Chief Executive Officer ("CEO") and chairman of the Board, defendant Paul Greig, and Huntington regarding Greig's lucrative, post-Merger consulting agreement with Huntington, **which was negotiated alongside the terms of the Merger** and which thus created a considerable potential conflict of interest.,

As outlined below, courts have consistently found such information to be material and therefore sufficient to support the approval of a settlement similar to the one reached here. *See, e.g., In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *48-49 (D.N.J. Mar. 25, 2010) (hereinafter, "*Merck*") (granting final approval of settlement where "the supplemental disclosures facilitated communication and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly"); *In re WM. Wrigley Jr. Co. S'holders Litig.*, No. 3750-VCL, 2009 Del. Ch. LEXIS 12, at *21 (Del. Ch. Jan. 22, 2009) (granting final approval where "the disclosure claims advanced in the complaint were fully and fairly addressed in the settlement").


III.    **ARGUMENT**

4

A. **THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED**

1. **The Applicable Legal Standard**

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of any compromise of claims brought on a class wide basis. In deciding whether a class action settlement merits final approval under Rule 23(e), courts must determine whether the proposed settlement is fair, reasonable, and adequate. *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 276 (6th Cir. 2016). The Sixth Circuit has identified the following factors that a Court may consider in evaluating the fairness of a class action settlement: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. V. Gen. Motors Corp.*, 497 F.3d, 615, 631 (6th Cir. 2007); *see also Gascho*, 822 F3d at 276.

The Sixth Circuit has endorsed an overriding public interest in favor of the settling of litigation – particularly class actions. *See Vassalle v. Midland Funding, LLC*, Docket No. 3:11-cv-00096, 2014 U.S. Dist. LEXIS 146543, at *17 ("It is axiomatic that the settlement of class-action litigation is favored."). Indeed, "[s]ettlement should be facilitated at as early a stage of the litigation as possible."  6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d §1522, at 225-26 (2d ed. 1990) (citing 1983 Advisory Committee Notes). "In evaluating settlements, such as this one, courts have recognized that complex litigation is 'notoriously difficult and unpredictable.'"  *Vassalle*, 2014 U.S. Dist. LEXIS at *17 (citation omitted). For this reason, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada Invest., Inc. v. DWG Corp*., 962 F.2d 1203, 1205 (6th Cir. 1992).

2. **The Settlement is Fair, Reasonable, and Adequate**

In connection with the Settlement, Defendants agreed to make the Supplemental Disclosures prior to the shareholder vote to remedy Plaintiffs' disclosure claims.

It is well-settled that curative disclosures, which provide material information to shareholders faced with a significant decision, such as whether or not to approve a merger, confer a substantial benefit. This is because "[a] fully informed shareholder vote in compliance with Section 14(a) of the Securities Act [ ] is in the best interests of shareholders and the shareholder public generally." *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392, at *17 (N.D. Cal. Oct. 23, 2012). Indeed, numerous courts have recognized that the most meaningful remedy for a violation of disclosure obligations in connection with a merger is the disclosure of the otherwise-withheld material information before the transaction is consummated, not a subsequent claim for money damages.[6] As a result, the type of relief obtained in the Settlement has frequently provided the basis for resolution of shareholders' claims similar to those in the Action. *See, e.g., Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 395-6 (1970) (observing that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action]" and that "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all stockholders by providing an

---

[6]     *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1149-50 (D. Kan. 2001) ("[T]he free and intelligent voting rights of plaintiff's shareholders will be forfeited if such votes are exercised based upon false or misleading information. Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights."); *St. Louis Police Ret. Sys.*, 2012 U.S. Dist. LEXIS 152392, at *16-17 ("disclosure deficiencies cannot be remedied effectively by an 'after-the-fact damages' case."); *In re Talley Indus., Inc. S'holders Litig.*, No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998) ("[T]he timely disclosure of the information in the supplement was presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process.").

important means of enforcement of the proxy statute").[7] As detailed herein, the Supplemental Disclosures were plainly material to FirstMerit's shareholders and, thus, support final approval of the Settlement.

> **a.  Information Concerning FirstMerit's and Huntington's Financial Projections Used in Sandler's Valuation Analyses**

*First*, the Supplemental Disclosures provided FirstMerit's former shareholders with critical information relating to the Company's and Huntington's financial projections. Generally speaking, the full and accurate disclosure of a company's financial projections is important to shareholders in merger transactions because shareholders are being asked to vote on the termination of the company's corporate existence and to forgo some or all of their future ownership in the company. *In re PNB Holding Co. S'holders Litig.*, No. 28-N, 2006 Del. Ch. LEXIS 158, at *59 (Del. Ch. Aug. 18, 2006) ("reliable management projections of the company's future prospects are of obvious materiality to the electorate"). Indeed, a company's financial projections have been described as "probably among the most highly-prized disclosures by investors." *In re Netsmart Techs., Inc., S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007).

In this case, the Proxy originally disclosed only the projections of FirstMerit's net income available to shareholders that Huntington management instructed its financial advisor, Goldman Sachs ("Goldman") to use in its valuations analyses. Plaintiffs, however, secured the

---

[7]     *See also McGill v. Hake*, Case No. 1:15-cv-00217-TWP-DKL (S.D. Ind. Mar. 10, 2016) (granting final approval of settlement that provided shareholders with supplemental disclosures) (Hopkins Decl. Ex. 12); *In re Kraft Foods Group, Inc.*, Case No. 3:15-CV-262-HEH (E.D. Va. Mar. 10, 2016) (same) (Hopkins Decl. Ex. 13); *Bunyan v. Ordan*, Case No. 1:12-cv-01185-CMH-TRJ (E.D. Va. Jan. 24, 2014) (same) (Hopkins Decl. Ex. 14); *In re GeoEye, Inc. S'holder Litig.*, Case No. 1-12-cv-00826-CMH/TCB (E.D. Va. Sept. 6, 2013) (same) (Hopkins Decl. Ex. J); *Merck*, No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *48-49 (D.N.J. Mar. 25, 2010) (granting final approval of settlement where "the supplemental disclosures facilitated communication and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly").

Supplemental Disclosure of **both** FirstMerit's and Huntington's 2016 through 2020 projections of net income available to common shareholders that were actually used by FirstMerit's financial advisor, Sandler, in its valuation analyses. Plainly, the projections used by FirstMerit and its financial advisor are what was relevant to FirstMerit's shareholders, not those used by Huntington. Indeed, it is well settled that the projections that were relied upon by the target's financial advisor in performing its financial analyses underlying its fairness opinion are important information to shareholders. *David P. Simonetti Rollover IRA v. Margolis*, C.A. No. 3694, 2008 Del. Ch. LEXIS 78, at *30 (Del. Ch. June 27, 2008) ("The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized.").

Importantly, the FirstMerit projections disclosed in the Supplemental Disclosures were those that were created and/or chosen by FirstMerit management who have the best insight into the Company's future prospects. *See Netsmart*, 924 A.2d at 203 (stating that the company's "stockholders would obviously find it important to know what management and the company's financial advisor's best estimate of those future cash flows would be"). As such, this Supplemental Disclosure was material to shareholders. Additionally, and also of significant importance, Plaintiffs secured an explanation as to why the FirstMerit projections used by Huntington's and FirstMerit's respective financial advisors were different, despite being based on similar assumptions. Notably, the newly disclosed projections used by FirstMerit **were materially lower** than the previously disclosed set of projections used by Huntington, which allowed shareholders to assess the reasonableness of Sandler's decision to use a lower set of projections to value the Company. *See* Affidavit of M. Travis Keath in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys'

8

Fees and Expenses, attached as Exhibit 7 to the Hopkins Decl. ("Keath Aff."), at ¶ 12. Shareholders, in turn, were now able to see how the lowered forecasts diminished the range of value implied by Sandler's Net Present Value ("NAV") analysis. *Id.* at ¶¶ 15-22. Moreover, the Supplemental Disclosures informed shareholders for the first time that the set of projections previously disclosed in the Proxy were not the ones used by Sandler in its valuation analyses. With this information, shareholders could re-run Sandler's Net Present Value and Pro Forma Merger Analyses with the higher set of projections used by Huntington/Goldman, which generally would have the effect of raising the implied value of the Company. *Id.* at ¶¶ 23-24.

For this disclosure alone, the Settlement should be approved. Indeed, as the Delaware Court of Chancery, which regularly presides over similar corporate law cases, has previously recognized:

> [W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the [] board as to how to vote ... rely.'

*Netsmart*, 924 A.2d at 202.[8]  Additionally, courts in this Circuit and throughout the country have placed a similar premium on the disclosure of projections.[9] It is therefore

---

[8]     *See also Netsmart*, 924 A.2d at 203 (describing progrections to be "among the most highly-prized disclosures by investors"); *In re Emerging Commc'ns, Inc. S'holder Litig.*, No. 16415, 2004 Del. Ch. LEXIS 70, at *13 (Del. Ch. May 3, 2004) (projections are "highly material" because knowledge of the projections "would have enabled the shareholders to understand [the company's] intrinsic worth and the extent of the market's undervaluation of their company"); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1339-40 (Del. Ch. 1987) (nondisclosure of "corporation's ... projected revenues or income" is "highly material and constituted violations of the defendants' duty of candor").

[9]     *See, e.g.*, *Nichting v. DPL Inc.*, No. 3:11-cv-141, 2011 U.S. Dist. LEXIS 76739, at *17 n.16 (S.D. Ohio July 15, 2011) ("it smacks of materiality that a voter be made aware of the Company's cash flow projections in order to make an informed decision."); *Smith v. Robbins &*

axiomatic that projections related to FirstMerit's future financial success as a standalone entity were material to FirstMerit shareholders in evaluating the Merger.

### b. Information Concerning Sandler's Financial Analyses

*Second*, Plaintiffs were also successful in obtaining material disclosures regarding Sandler's valuation analyses, including its Comparable Company Analyses of each of FirstMerit and Huntington, Analysis of Selected Merger Transactions, and Net Present Value Analyses. These analyses were relied upon by Sandler to render its fairness opinion, and relied upon by the Board in making its decision to approve the Merger. This information is also material because it directly concerns the value of the Company. *See In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) ("[S]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers" because the bankers' valuation analyses "usually address the most important issue to stockholders - the sufficiency of the consideration being offered to them for their shares in a merger or tender offer.").

Specifically, with respect to each of Sandler's Comparable Company Analyses of each of FirstMerit and Huntington, the Supplemental Disclosures provided FirstMerit's shareholders with the individually observed multiples and benchmarking statistics of the selected companies and transactions that were compared to FirstMerit's, Huntington's, and the Merger's respective statistics. The disclosure of the observed multiples and benchmarking statistics was necessary because they are crucial elements of these market-based analyses, as these analyses are fundamentally based on comparison and relative valuation. *In re Radiology Assocs., Inc.*, 611

---

*Myers, Inc.*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) (finding omitted line items from financial projections were material because the projections were used by the financial advisor in its fairness analyses); *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at *70 (C.D. Cal. June 17, 2010) ("A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. 'There is a substantial likelihood that a reasonable shareholder would consider it important' in making his decision.") (citation omitted).

A.2d 485, 490 (Del. Ch. 1991) ("The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison. At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes.").[10]

The Supplemental Disclosure of these multiples and benchmarking statistics was particularly important here because FirstMerit's metrics generally were lower than the mean multiples of the selected comparable companies and transactions. Generally speaking, bankers should select companies and transactions that have similar financial characteristics to the target company/transaction at issue. In light of FirstMerit's generally lower multiples compared to the selected comparables, the full disclosure of the selected companies' and transactions' multiples was important to shareholders. *See* Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, at 68 (1993) (noting that an investment bank that values a company using the market approach by employing the mean and median multiples generated by the comparables "is less likely to be accused of 'cherry picking' in order to reach a particular conclusion").[11]

---

[10]     *See also Prescott Grp. Small Cap, L.P. v. Coleman Co.,* C.A. No. 17802, 2004 Del. Ch. LEXIS 131, at *81 (Del. Ch. Sept. 8, 2004) (rejecting comparable company analysis in an appraisal action where "none of [the defendant's expert's] 'comparables' was truly comparable to [the subject company] in any meaningful sense, and none of them had economics similar to [the subject company's]…"); *In re Celera Corp. S'holder Litig*., No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *122 (Del. Ch. Mar. 23, 2012), *rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012) ("[A] fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions."); *Turberg v. ArcSight*, C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) (Transcript) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be on there, just like they're in there when you give them to the board . . . . [Y]ou would never see a board book that would go to the board without the background multiples.").

[11]     It is also well-settled that, when a disclosure document "ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of facts." *Pure Res.*, 808 A.2d at 448; *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76-77 (Del. Ch. 2007).

Relatedly, the Supplemental Disclosures informed shareholders that, in Sandler's Net Present Value Analyses of each of FirstMerit and Huntington, Sandler selected the price-to-earnings and tangible book value multiples used in those analyses from Sandler's review of the comparable companies observed in Sandler's Comparable Company Analyses. In light of the issues surrounding Sandler's choice of comparables in that analysis (as outlined above), this acknowledgement provided greater transparency into Sandler's Net Present Value Analyses and allowed shareholders to frankly assess the reliability of these analyses. *See Netsmart*, 924 A.2d at 203-04 ("[W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.").

The above-outlined key assumptions and methodologies made by Defendants were therefore required to provide the Company's shareholders with a complete and fair summary of Sandler's various analyses. Without the disclosure of this information, the summaries of Sandler's analyses were materially misleading and incomplete.

### c.       Information Concerning the Background of the Merger

*Third*, the Supplemental Disclosures provided shareholders with material information relating to the events leading to the Merger. Shareholders "are entitled to a balanced and truthful

---

Information pertaining to an expert's financial analysis is one such subject. *See id.* (financial advisor's changes to valuation were not explained and the proxy statement was therefore materially misleading); *Maric Capital Master Fund, Ltd.*, 11 A.3d 1175, 1177-78 (Del. Ch. 2010) ("Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion . . . . [B]ecause the failure to described what the banker actually came up with . . . the proxy statement presents a range that suggests that the merger price is far more attractive ….").

recitation of events, not a sanitized version that is materially misleading." *Pure Res.*, 808 A.2d at 451. Moreover, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . ., they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994).

The most significant Supplemental Disclosure concerning the background of the Merger related to the potential conflict of interest of Paul Greig, FirstMerit's President. CEO, and Chairman of the Board, as a result of a consulting agreement that he entered into with Huntington. Pursuant to that consulting agreement, Mr. Greig will provide strategic advice regarding FirstMerit's business and other services for up to thirty hours per month for a term of three years, and will be paid $1,250,000 per year, in addition to other benefits and perks.

Notwithstanding these substantial benefits and the resulting risk for a conflict of interest, the Proxy was silent as to the nature and timing of communications between representatives of Huntington and Mr. Greig concerning his post-Merger consulting agreement. The Supplemental Disclosures cured this material non-disclosure by informing shareholders that Mr. Greig's consulting agreement was negotiated during the period between December 9, 2015 and January 25, 2016 (the date the Merger Agreement was signed) – *i.e., **while*** negotiations over the terms of the Merger were taking place.

The Supplemental Disclosure of such a potential conflict is highly material to shareholders. After all, Mr. Greig was heavily involved in the negotiation of the Merger, and, as Chairman of the Board, ultimately approved the Merger and recommended that the Company's shareholders approve it. Under well-settled law, shareholders are entitled to understand considerations and factors that may influence the negotiations of a merger:

> Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.

*In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007).

Indeed, the Delaware Court of Chancery has enjoined mergers pending the disclosure of employment discussions with board and management members during merger negotiations, even when those discussions did not result in a formal agreement on the terms of post-merger employment. *See In re Atheros Commc'ns, Inc. S'holder Litig.*, No. 6124-VCN, 2011 Del. Ch. LEXIS 36, at *41-42 (Del. Ch. Mar. 4, 2011) ("Knowledge that, even though specific terms were not elicited until later in the process, Barratt was aware that he would receive an offer of employment from Qualcomm at the same time he was negotiating, for example, the Transaction's offer price, would be important to a reasonable shareholder's decision regarding the Transaction.").[12] Accordingly, this Supplemental Disclosure was important to FirstMerit shareholders, as it allowed them to consider for themselves whether a conflict of interest was present.

### 3. The Settlement is the Product of Good Faith, Arm's-Length Negotiations

---

[12]    *See also Maric Capital,* 11 A.3d at 1179 (enjoining the merger and stating that, "[a]lthough it may be the case that there were not 'negotiations' over a formal employment agreement between PLATO's CEO, Vincent Riera, and Thoma Bravo, the reality is that Riera had extended discussions with Thoma Bravo in which the typical equity incentive package given by Thoma Bravo to management was discussed"); Transcript of Proceedings, *In re Complete Genomics, Inc. S'holders Litig.*, No. 7888-VCL (Del. Ch. Nov. 9, 2012) (granting preliminary injunction in part due to lack of disclosure of communications concerning the CEO's expected continuing post-transaction employment) (Hopkins Decl., Ex. H).

The Settlement was reached following extensive, arm's-length negotiations between the Parties, which negotiations were extensive and adversarial. Plaintiffs' counsel and Defendants' counsel exchanged several proposals and counter-proposals concerning the nature and scope of the Supplemental Disclosures. Hopkins Decl., ¶ 6. At the conclusion of these negotiations, and after fully analyzing the merits of all Parties' contentions, including the impact of the proposed Settlement on Plaintiffs and absent Settlement Class Members, Plaintiffs and Plaintiffs' counsel entered into the Stipulation. Importantly, during the negotiations, all Parties had a clear view of the strengths and weaknesses of their respective claims and defenses, and the Settlement is the product of arm's-length negotiations between the Parties, who were all represented by counsel with extensive experience and expertise in shareholder litigation.

## 4. The Complexity, Time, and Expense of Continued Litigation Supports Final Approval of the Settlement

Prosecuting this litigation through trial and appeal would be lengthy and complex, and would impose significant costs on all Parties. *See, e.g.*, *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them"). Continued proceedings would likely include class certification proceedings, trial, and appeal. Given the nature of the Action, a battle of the experts at trial is almost a certainty, and continued proceedings would likely include significant expert discovery and related motion practice.

The Settlement, by contrast, delivers a real and substantial remedy to the Class without the risk or delay inherent in prosecuting this matter through trial and appeal. The Settlement avoids considerable costs, commitments of time by the Parties and their counsel, and demands on the Court's resources. Thus, this factor favors final approval of the Settlement. *See, e.g.*,

*Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 455 (E.D. Pa. 1990) (approving a class action settlement because, in part, the settlement "will alleviate . . . the extraordinary complexity, expense and likely duration of this litigation"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("Instead of the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to recovery for the Class.").

### 5. The Stage of Proceedings and the Amount of Discovery Completed

Plaintiffs conducted substantial discovery (both pre- and post-MOU) and consulted with a valuation expert, who provided substantial assistance in confirming that the proposed Settlement is fair, reasonable, and adequate. In addition, by making the Supplemental Disclosures, Defendants provided shareholders with the crux of the relief sought by Plaintiffs in connection with their federal securities law and fiduciary duty claims. Plaintiffs alleged that Defendants violated Sections 14(a) and 20(a) of the Exchange Act and their fiduciary duties by causing the materially incomplete disclosures in support of the Merger to be disseminated to FirstMerit's shareholders. The Supplemental Disclosures effectively eliminated the bases underlying those claims by providing the previously omitted information.

### 6. The Strength of Plaintiffs' Case Compared to the Terms of the Settlement Supports Approval of the Settlement

Here, the Supplemental Disclosures conferred a substantial benefit on the Class by permitting FirstMerit shareholders to make an informed decision on whether to approve the Merger. *See* Section III.A.2, *supra*. While Plaintiffs believe that their disclosure claims were strong, they believe that securing the Supplemental Disclosures was in the best interest of the Class – especially in light of the fact that Plaintiffs sought primarily disclosure-related relief and

16

when weighed against the possibility of losing their then-pending Motion for Preliminary Injunction, which sought to secure much of the same information disclosed in the Supplemental Disclosures.

The decision to enter into the Settlement was made with knowledge of the uncertainty of Plaintiffs' claims and the difficulty of obtaining the extraordinary relief of enjoining the Merger. In order to have received full recovery, Plaintiffs' first hurdle would have been succeeding on a motion to enjoin the Merger. Plaintiffs recognize that an injunction is an extraordinary remedy, which requires a showing of probable success on the merits, irreparable harm, and a balance of the injuries in favor of Plaintiffs. *See, e.g.*, *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). In the event the injunction had been granted, Plaintiffs would then have to succeed after a full trial on the merits of the case. If the injunction had been denied, Plaintiffs would have lost the ability to receive additional disclosures prior to the shareholder vote, and FirstMerit shareholders would not have obtained all the information needed to make a fully informed decision prior to the shareholder vote.

Plaintiffs also knew that, despite the substantial evidence obtained in support of their claims, proving that Defendants breached their fiduciary duties would be a difficult task fraught with uncertainty. In addition, Defendants have continually and vigorously denied all of the allegations against them. Defendants' ability to mount a rigorous and well-represented defense would have proven a significant hurdle for Plaintiffs to overcome, both in obtaining preliminary injunctive relief and in the case on the merits. Once Plaintiffs' financial experts had determined the Merger price to be within the range of reasonableness, and Plaintiffs' counsel reviewed relevant SEC filings and other available Company information, it became clear that it would be

in the Class' best interest to obtain additional material disclosures such that each Class member could make a fully-informed decision.

### 7. The Views of Experienced Counsel

The opinion of competent counsel is a factor to be considered by the Court in determining whether the Settlement is fair, reasonable, and adequate. *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sep. 1, 2011) ("The Court gives great weight to the recommendation of experienced counsel for the parties in evaluating the adequacy of the settlement."); *Bert v. AK Steel Corp.*, No. 1:02-cv-467, 2008 U.S. Dist. LEXIS 111711, at *9 (S.D. Ohio Oct. 23, 2008) (Class counsel's "opinion that the proposed settlement is fair to the class is entitled to considerable weight."); *Smith v. Ajax Magnethermic Corp.*, No. 4:02-CV-0980, 2007 U.S. Dist. LEXIS 85551, at *14 (N.D. Ohio Nov. 6, 2007) ("The Sixth Circuit has held that, in the context of approving class action settlements, the Court 'should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs.'") (citations omitted).

Here, counsel for Plaintiffs have extensive experience litigating complex class actions, including matters involving mergers and acquisitions and the federal securities laws, and are of the opinion that the Settlement is fair, reasonable and adequate. *See* Hopkins Decl. Exs. 1; 2-A; 3-A; 4-A; 5-A (Firm résumés for Plaintiffs' counsel). Plaintiffs' counsel is "well informed as to the operative facts" and "considerable risks" of the Action. *See Reade Alvarez v. Eltman, Eltman, & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). It is Plaintiffs' counsel's informed opinion that, given the uncertainty and further substantial expense of pursuing the Action against the Defendants, and the significant benefit obtained through the Supplemental Disclosures, the proposed Settlement is in the best interests of the Class. This endorsement militates in favor of final approval.

18

### 8.   The Class Overwhelmingly Supports the Settlement

The reaction of the proposed Class – or lack thereof – further supports approval of the Settlement. *See, e.g.*, *Brent*, 2011 U.S. Dist. LEXIS 98763, at *50 ("The fact that very few class members opted out or objected indicates that the settlement is adequate"); *Kosseff v. Ciocia*, No. 188, 2009 Del. Ch. LEXIS 242, at *1 (Del. Ch. Feb. 26, 2009); *In re Delphi Corp. Sec.*, 248 F.R.D. 483, 498-99 (E.D. Mich. 2008) ("A certain number of opt-outs and objections are to be expected in a class action. If only a small number [of opt outs or objections] are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Doe v. Bradley*, 64 A.3d 370, 396 (Del. Super. Ct. 2012) (fact that only one objection is raised from class of thousands was significant in showing settlement's fairness.). In the Notice, FirstMerit shareholders were apprised of the background of the Action, the benefits achieved in the Settlement, and that Counsel would be petitioning the Court for a fee and expense award not to exceed $315,000.00. To Plaintiffs' knowledge, to date, no formal objections to the Settlement have been received.

### 9.   The Public Interest Favors Approval of the Settlement

As noted above, there is a strong public policy in favor of the settlement of class actions. *Vasalle*, 2014 U.S. Dist. LEXIS 146543 at *18; *Bailey*, 2008 U.S. Dist. 16704. There is an equally strong public policy in favor of class actions that vindicate rights which are legitimate and meaningful, but are nonetheless uneconomical to prosecute individually. *See, e.g., Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 782 (N.D. Ohio 2010) ("Class actions are meant to serve the public interest by providing an incentive for lawyers and class representatives to litigate on behalf of a group of people whose injury is legitimate and meaningful, but whose individual damages are not substantial enough to make litigation on an individual basis worthwhile."). Because the ability of a shareholder to exercise its franchise in an informed manner is vital to

corporate governance, any action that furthers that salutary goal should be considered as serving the public interest. *See, e.g., In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) (noting "the stockholders' right to cast an informed vote"). Accordingly, this factor likewise supports final approval of the Settlement.

In sum, the course of this Action, the Settlement negotiations, and the terms of the Settlement raise no questions as to the proposed Settlement's fairness. The parties have assessed the strengths and weaknesses of their claims and defenses in the Action, and based on their considerable experience prosecuting similar claims, they are satisfied that the proposed Settlement achieved here is fair, reasonable, and adequate to FirstMerit's shareholders.

## IV. CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES

In presenting the proposed Settlement to the Court for preliminary approval, Plaintiffs requested that the Court preliminarily certify the Class for settlement purposes so that notice of the proposed Settlement, the Settlement Hearing, and the rights of the Class members to object could be issued to the Class. In its October 31, 2016 Preliminary Approval Order, this Court preliminarily certified the Class. *See* ECF No. 90 at ¶ 3. Nothing has changed to alter the propriety of certification of the Class and, for all the reasons stated in Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval (which is incorporated herein by reference), Plaintiffs now request that the Court affirm its determinations in the Preliminary Approval Order and finally certify the Class for purposes of carrying out the Settlement. In addition, Plaintiffs request that the Court affirm its certification of Lead Plaintiffs as Class Representatives for the Class and its appointment of Lead Counsel as Class Counsel for the Class.

## V. THE FEE AND EXPENSE AWARD SHOULD BE APPROVED

20

For the benefits conferred through this Action and the Settlement, Plaintiffs' counsel seek (and Defendants do not oppose) approval of the Fee and Expense Award of $315,000. The requested award is consistent with – and is, in fact, modest when compared to – awards granted to counsel for obtaining similar relief in precedent actions prosecuted around the nation. Additionally, the requested award represents a negative multiplier to Plaintiffs' counsel's collective lodestar of approximately $477,236.8 and no Class members have filed a formal objection to the request. Hopkins Decl., ¶¶ 8-9.

## A.  THE APPLICABLE LEGAL STANDARD

Courts have long permitted counsel who create a benefit for others to recover their expenses, including reasonable attorneys' fees, from those who enjoy the benefit conferred. *See, e.g., Boeing Co. v. Van Gernert*, 444 U.S. 472, 478 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975); *Mills*, 396 U.S. at 394-95 (1970). An award of attorneys' fees is appropriate if: (1) an attorney confers a substantial benefit, (2) to members of an ascertainable class, and (3) the court ensures that the costs are proportionately spread among that class. *See Hall v. Cole*, 412 U.S. 1, 5 (1973); *Mills*, 396 U.S. at 393-394; *Smillie v. Park Chem. Co*., 710 F.2d 271, 275 (6th Cir. 1983) ("A litigant who created a 'common fund' or 'substantial benefit' allocable with some exactitude to a definitive group of persons may acquire an equitable claim against that group for the costs incurred in creating the fund or benefit."). Under this doctrine, attorneys' fees are awardable even though the benefit conferred is purely non-pecuniary in nature. *Mills*, 396 U.S. at 396; *Ramey v. Cincinnati Enquirer, Inc*., 508 F.2d 1188 (6th Cir. 1974) (in actions where "it may be impossible to assign monetary value to the benefit . . . the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its

21

shareholders") (citations and internal quotations omitted). As outlined below, an award of fees and expenses is appropriate here because all three of these elements are satisfied.

In assessing the reasonableness of a fee and expense award, courts in the Sixth Circuit regularly employ the "lodestar" method. *Rawlings v. Prudential-Bache Prop., Inc.*, 9 F.3d 513, 515-15 (6th Cir. 1993); *Kirchoff v. Flynn*, 786 F.2d 320, 328 (7th Cir. 1986) ("the lodestar approach is best in cases with substantial injunctive or precedent-creating components"). Once the lodestar figure is calculated, the Sixth Circuit permits district courts to adjust the amount up or down after considering various relevant factors, including "the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved." *Rawlings*, 9 F.3d at 516; *Gascho*, 822 F.3d at 279.

Finally, the United States Supreme Court lauds the consensual resolution of attorneys' fee awards as the ideal toward which litigants should strive. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (a "request for attorney's fees should not result in a second major litigation. Ideally, of course, ***litigants will settle the amount of a fee***.") (emphasis added). In representative litigation, it is widely recognized that fee agreements between plaintiffs and defendants are preferred. *See, e.g., Johnson v. Ga. Highway Express*, *Inc*., 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees."). The courts of this Circuit have likewise recognized that "[n]egotiated and agreed-upon attorneys fees as part of a class-action settlement are encouraged as an 'ideal' toward which the parties should strive."  *Bailey*, 2008 U.S. Dist. LEXIS 16704, at *2-*3. "[C]ourts are especially amenable to awarding negotiated attorneys fees and expenses in a reasonable amount where the amount is in addition to and separate from the defendant's settlement with the class [and] fees

22

negotiated and paid separate and apart from the class recovery are entitled to a 'presumption of reasonableness." *Id*. (citations omitted). Indeed, in class actions such as this, the Federal Rules of Civil Procedure explicitly provide courts with the discretion to "award reasonable attorney's fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

Consistent with the foregoing precedent, the Parties negotiated an amount of fees and expenses that FirstMerit or its successors agreed not to oppose and to pay. Stipulation, ¶6.1. That amount reflects a compromise reached through arm's-length bargaining by informed Parties. More importantly, the Parties broached the issue of fees and expenses only after reaching agreement on all other terms and provisions of the Settlement. Thus, the agreement to pay attorneys' fees and expenses did not reduce or otherwise affect the benefits to FirstMerit shareholders in any way.

Moreover, the Parties' negotiations were based upon a knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees approved in similar situations. Plaintiffs' counsel negotiated with defense counsel, who saw the efforts made by Plaintiffs' counsel firsthand. Defense counsel have an interest in protecting their clients, who have a direct financial stake in the amount of the fees and expenses to be paid. Defendants are represented by highly-skilled lawyers, and do not need (and have not sought) protection from the Court for the results of their own negotiations regarding the amount of the fees and expenses to be paid. All counsel were able to consider and utilize as precedent fee decisions from similar actions. In such circumstances, the end result of those negotiations—which reflects all of the counsel's experience and views as to what is appropriate—is entitled to significant weight in considering Plaintiffs' counsel's fee request. *See, e.g., Prandini v. Nat'l Tea Co*., 557 F.2d 1015 (3d Cir.

1977) (absent evidence of collusion, a negotiated fee that does not diminish the amount of recovery by a class is entitled to substantial weight and deference.).

**B. A FEE AND EXPENSE AWARD IS APPROPRIATE**

As an initial matter, a fee and expense award is appropriate in this case because all three elements of the substantial benefit doctrine are satisfied. *First*, as discussed *supra*, Plaintiffs and their counsel conferred a substantial benefit upon FirstMerit shareholders by obtaining the Supplemental Disclosures, which enabled FirstMerit shareholders to make a fully-informed decision in connection with the shareholder vote on the Merger. *See* § III.A.2, *supra*. Courts have long recognized that obtaining such non-monetary benefits for a class can provide substantial value and support a court-approved award of attorneys' fees and expenses.[13] Plaintiffs' counsel's services to the Class were thus of material value to the shareholders and entitle counsel to a reasonable fee award.

*Second*, the benefiting class consists of a group of readily identifiable beneficiaries – namely, the proposed Class, as defined in the Stipulation. Stipulation, § 1.2 (Class definition). The substantial benefit arising from the Action through the Settlement – *i.e.*, the Supplemental Disclosures – was disseminated to all FirstMerit shareholders sufficiently in advance of the shareholder vote on the Merger to enable them to make an informed decision. In light of these

---

[13] *See, e.g., Mills*, 396 U.S. at 396 ("In many suits under §14(a), particularly where the violation does not relate to the terms of the transaction for which proxies are solicited, it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders."); *Kahan v. Rosenstiel*, 424 F.2d 161, 166 (3d Cir. 1970) ("the award of attorney's fees is not limited to circumstances in which there is a monetary fund from which fees may be paid, but extends to any situation in which the litigation has conferred a substantial benefit on the members of an ascertainable class").

facts, the Class is ascertainable and consists of readily identifiable members. *See Merck*, 2010 U.S. Dist. LEXIS 29121, at \*49-51.

Finally, the payment of the requested fee and expense award will be spread proportionally, as FirstMerit and/or its insurers have agreed to bear the award of fees and expenses, and no member of the Class is expected to contribute directly to the payment of such an award. *See Hall*, 412 U.S. at 7 ("Under these circumstances, reimbursement of the plaintiffs' attorneys' fees out of the corporate treasury simply shifted the costs of litigation to the class that has benefited from them and that would have had to pay them had it brought the suit.") (internal citations omitted); *see also Merck*, 2010 U.S. Dist. LEXIS 29121, at \*50-51. Accordingly, and in light of the substantial benefits conferred on FirstMerit shareholders, Plaintiffs' counsel are entitled to an award of reasonable fees and expenses.

## C. THE REQUESTED FEE AND EXPENSE AWARD IS REASONABLE

Determining the amount of a fee and expense award is a matter that rests within the sound discretion of the trial court. "In determining the reasonableness of the fee award, Courts generally consider the following factors: (1) the value of the benefit rendered to the class (*i.e.*, the results achieved); (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Vigna v. Emery Fed. Credit Union*, No. 1:15-cv-51, 2016 U.S. Dist. LEXIS 166605, at \*10-\*11 (S.D. Ohio Dec. 2, 2016); *Ramey, Inc*., 508 F.2d 1188.

### 1. The Value of the Services on an Hourly Basis

Collectively, Plaintiffs' counsel expended approximately 852 hours of attorney and paralegal time prosecuting the Action on behalf of the Class. *See* Time and Expense Affidavits of

Plaintiffs' Counsel, attached hereto. Hopkins Decl. Exs. 1-5. "Under the lodestar method of calculation, the Court 'multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.' The Court then has the direction to 'enhanc[e] the lodestar with a separate multiplier [that] can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved.'" *See Walls v. JPMorgan Chase Bank, N.A.,* No. 3:11-cv-673-DJH, 2016 U.S. Dist. LEXIS 142325, at *18 (W.D. Ky. Oct. 13, 2016) (quoting *Gascho*, 822 F.3d at 279). Applying their reasonable hourly rates,[14] Plaintiff's Counsel's collective lodestar is $477,236.80. *See* Hopkins Decl., ¶ 15. After accounting for the expenses incurred, the proposed fee award of $315,000 reflects a negative multiplier to the lodestar of $499,132.76. *See id*.

### 2. The Contingent Nature of the Fee

Plaintiffs' counsel accepted this case on a contingency fee basis and, therefore, they have received no compensation during the course of this Action, despite incurring expenses in prosecuting the claims for the benefit of the Class. This factor should be considered in evaluating the reasonableness of the Fee and Expense Award. *See*, *e.g.*, *Smillie*, 710 F.2d at 275

---

[14]     The rates charged by Plaintiffs' counsel are reasonable given their legal reputation, experience, and status. Hopkins Decl., ¶ 13. Plaintiffs' counsel are highly regarded firms that practice extensively in the complex and specialized field of shareholder litigation. *See* Firm Resumes attached as Exhibit A to each Plaintiffs' Counsel's time and expense affidavit, Hopkins Decl., Exs. 1-5; *see Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760 at *768 (7th Cir. Ind. 1982) (noting that attorneys with specialized skills in a narrow area of law tend to be found in large cities and charge more for performing services in this area of expertise than a general practitioner will charge for performing similar services). Thus, Plaintiffs' counsel's rates are well within the range charged by attorneys with comparable experience. *See*, *e.g.*, *Abbott v. Lockheed Martin Corp.*, No. 06cv-701, 2015 U.S. Dist. LEXIS 93206, at *11-12 (S.D. Ill. July 17, 2015) (finding the reasonable hourly rate for Class Counsel's services is as follows: for attorneys with at least 25 years of experience, $974 per hour; for attorneys with 15-24 years of experience, $826 per hour; for attorneys with 5-14 years of experience, $595 per hour; for attorneys with 2-4 years of experience, $447 per hour; for Paralegals and Law Clerks, $300 per hour; for Legal Assistants, $186 per hour).

(consideration must be given to "whether the services were undertaken on a contingent fee basis"); *Broadwing*, 252 F.R.D. at *382 (noting the risk plaintiffs' counsel took "of no payment if the case was unsuccessful"). Because of the contingent nature of the representation in the Action, any award of fees and expense reimbursement to Plaintiffs' counsel has always been at risk and completely contingent on the result achieved. Moreover, "the appearance of Plaintiff's counsel in this case precluded [them] from engaging in other lucrative work." *Id.*, 252 F.R.D. at 382 (citation and internal quotations omitted).[15]

Given the contingent nature of Plaintiffs' counsel's compensation, a premium over counsel's normal hourly rate is appropriate.[16]  In awarding attorneys' fees to class counsel, it is appropriate that "[o]nce the total number of hours and the hourly rate are calculated ... it is then necessary to consider if the lodestar rate should be increased." *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 326 (N.D. Ill. 1981). "The court 'may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Gascho*, 822 F.d at 279 (*quoting Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343 (6th Cir. 2000).

---

[15]    Delaware courts, which more frequently address litigation such as this, fully recognize the significance of a contingency fee arrangement when considering fee awards. *See, e.g.*, *Franklin Balance Sheet Inv. Fund v. Crowley*, C.A. No. 888-VCP, 2007 Del. Ch. LEXIS 133, at *38-39 (Del. Ch. Aug. 30, 2007) ("Fee awards should encourage future meritorious lawsuits by compensating the Plaintiff's attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation, and premium. In *Globis Capital Partners v. Safenet*, No. 2772-VCS (Del. Ch. Dec. 20, 2007), the court awarded a fee of $1.2 million, which equated to approximately $1,500 per hour, in a disclosure-only settlement, reasoning: "you need to reward people who took real risk and hit a home run ... [W]hen you look at this particular situation, it's clear that the Plaintiff really did achieve substantial disclosure." *Id.* at 34, 44, 49.

[16]    *See Hensley*, 461 U.S. at 448 (explaining that "[o]n many occasions awarding counsel fees that reflect the full market value of their time will require paying more than their customary hourly rates" and noting that contingency arrangements cause lawyers to bear the risk of non-recovery usually borne by clients in cases where lawyers are paid an hourly rate, and also cause lawyers to forfeit time value of money); *Dutchak v. Cent. States, Se. & Sw. Areas Pension Fund*, 932 F.2d 591, 595 (7th Cir. 1991) (noting that contingent litigation weighs heavily in favor of increasing the lodestar because "there were inherent uncertainties in pursuing the claim.").

### 3.   The Value of the Benefit Rendered to the Class

As outlined above, the Settlement unquestionably conferred a substantial benefit on the Class. *See* § III.A.2, *supra*. Indeed, the full benefit of the Settlement has already been conferred on the class (the Supplemental Disclosures were disseminated prior to the stockholder vote) and the Fee and Expense Award, thus, will not diminish the benefit to the Class. Rather, by agreement, the payment will come entirely from Defendants.

What is more, courts within the Sixth Circuit and across the country have awarded plaintiffs' counsel fees and expenses consistent with or higher than the amount requested here in cases where the relief obtained was additional supplemental or curative disclosures. *See, e.g., Nichting*, No. 3:11-cv-00141, slip op. (S.D. Ohio Feb. 24, 2012) ($700,000 in fees and expenses for supplemental disclosures) (Hopkins Decl., Ex. 9); *Collier v. Brightpoint, Inc.*, No. 1:12-cv-01016, 2013 U.S. Dist. LEXIS 62125, at *9 (S.D. Ind. May 1, 2013) ($600,000 in fees and expenses for supplemental disclosures in a merger); *In re GeoEye, Inc., S'holder Litig.*, Consol. No. 1:12-cv-00826, slip op. (E.D. Va. Sept. 6, 2013) ($475,000 in fees and expenses for supplemental disclosures) (Hopkins Decl., Ex. 10); *Denney v. Wallace*, No. 2:10-cv-01154, slip op. (W.D. Pa. Sept. 9, 2011) ($475,000 in fees and expenses for supplemental disclosures) (Hopkins Decl., Ex. 11).

### 4.   The Complexity of the Litigation

The instant Action involved complex factual and legal issues. Among the questions of law and fact presented were the impact of both Ohio's appraisal statute, Ohio Rev. Code § 1701.85, and the business judgment rule on Plaintiffs' claims, their standing to pursue direct claims for breach of fiduciary duty and violations of the federal securities laws, and other corporate litigation issues, such as the Individual Defendants' fiduciary duties to FirstMerit's shareholders in the merger context under Ohio law. Plaintiffs' counsel conducted an extensive

factual investigation and analyses of FirstMerit's financial condition, through SEC filings, public statements, news and analyst reports, and nonpublic financial information and documents provided during discovery. Moreover, because of the inherent speed of merger-related litigation, Plaintiffs' counsel were required to complete all of this legal, factual, and financial investigation in an extremely compressed time frame. The complexity of the Action supports the Court's approval of the Fee and Expense Award.

### 5. The Professional Skill and Standing of Plaintiffs' counsel

To successfully pursue the Action, Plaintiffs' counsel had to possess expertise in the corporate law governing the fiduciary duties of officers and directors and the federal law governing those directors' and officers' duty of disclosure, as well as the knowledge to distill and analyze facts giving rise to Plaintiffs' claims from thousands of pages of documents. The efforts of Plaintiffs' counsel were not conducted in a vacuum. Aligned against them were some of the most preeminent defense counsel in the country, equally knowledgeable of corporate shareholder law and fully capable of capitalizing on any misstep or weakness, who could draw upon the exceptional resources of their well-regarded regional and national law firms. The skills and abilities of defense counsel are factors that may be considered in evaluating a fee request. *Delphi*, 248 F.R.D. at 504.

### 6. Society's Stake in Rewarding Attorneys Who Produce Such Benefits in Order to Maintain an Incentive to Others

Rewarding attorneys in class actions that involve voting rights or other securities issues is important because, absent such litigation, most affected shareholders would lack the resources to litigate the matters, and individual recoveries are often too small to justify the burden and expense of such litigation. *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 765-766 (S.D. Ohio 2007) (citing *In re Telectronics Pacing Sys.*, 137 F. Supp. 2d 1029 at *1043 (S.D.

Ohio 2001)) ("Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling ... claimants to pool their claims and resources" to "achieve a result they could not obtain alone"). Under such circumstances, a class action was the most cost efficient manner – and perhaps the only way – to litigate this Action.

**VI.**     **<u>CONCLUSION</u>**

Plaintiffs respectfully request that the Court enter the Order and Final Judgment, thereby finally approving the Settlement, finally certifying the Class for settlement purposes, and approving the Fee and Expense Award.

Dated: January 11, 2017

Respectfully submitted,

**PERANTINIDES & NOLAN CO., L.P.A.**

/s/ Chris T. Nolan
CHRIS T. NOLAN (0006617)
300 Courtyard Square
80 South Summit Street
Akron, OH  44308-1736
(330) 253-5454
(330) 253-6524 Fax
Email: cnolan@perantinides.com

**GOLDENBERG SCHNEIDER, L.P.A.**
Jeffrey S. Goldenberg (#0063771)
Robert Sherwood (#0084363)
One West Fourth Street, 18th Floor
Cincinnati, 011 45202
(513) 345-8291

*Interim Co-Liaison Counsel*

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina
Christopher R. Tillotson
206 Covington Street
Madisonville, LA 70447
(504) 455-1400
(504) 455-1498

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Sebastiano Tornatore
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (203) 992-4523
Fax: (212) 363-7171

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel: (302) 295-5310

*Interim Co-Lead Counsel*

31

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on January 11, 2017, a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system.  All parties not capable of receiving electronic documents will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

          /s/Chris T. Nolan
          Chris T. Nolan (#0006617)
          Attorney for Plaintiffs